# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| RICHARD M. METZLER | § | |
| | § | |
| V. | § | CASE NO. 4:13-CV-278 |
| | § | Judge Mazzant |
| XPO LOGISTICS, INC. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment (Dkt. #76), Defendant/Counterclaim Plaintiff XPO Logistics, Inc.'s Partial Summary Judgment Motion (Dkt. #78), Metzler's Motion to Strike XPO's Reply in Further Support of Its Summary Judgment Motion (Dkt. #109), and XPO Logistics, Inc.'s Opposed Motion for Leave to Supplement Summary Judgment Record (Dkt. #110). After considering the motions, the responses, and the relevant pleadings, the Court finds as follows with regard to each motion.

## BACKGROUND[1]

Plaintiff, Richard M. Metzler ("Plaintiff" or "Metzler"), entered into an Employment Agreement with XPO Logistics, Inc. ("XPO") on or about October 5, 2011 (the "Employment Agreement"), to become the Senior Vice President of Acquisitions for XPO. XPO is a North American company providing transportation logistics services in the non-asset based logistics sector, meaning that it arranges logistics and transportation services for customers utilizing assets

---

[1] Plaintiff objects to numerous statements made in the declaration of Bradley S. Jacobs ("Mr. Jacobs"), which is made in support of XPO Logistics, Inc.'s partial summary judgment motion, as well as many of the exhibits attached thereto (Dkt. #91). In objection number eleven, Plaintiff objects to the following statement of Mr. Jacobs, on the basis that it is an improper legal conclusion: "As of that date, XPO's investigation was already well underway, Metzler had already been placed on paid leave, he had already received XPO's Notice of Cause for Termination letter, and numerous breaches of the Employment Agreement constituting further Cause for termination had already been uncovered before Metzler first suggested, in his Original Petition, that he was being discriminated against because of age." The Court agrees that the second portion of that sentence is an improper legal conclusion, and thus, the following will be stricken from the affidavit of Mr. Jacobs: "…and numerous breaches of the Employment Agreement constituting further Cause for termination had already been uncovered before Metzler first suggested, in his Original Petition, that he was being discriminated against because of age." Plaintiff's objection number eleven is sustained. Plaintiff's remaining objections are overruled.

such as trucks, railcars, and planes owned by others.  Metzler has worked in the transportation and logistics industry for over thirty-five years, and has held executive-level positions for some of the largest logistics companies in the world.  Metzler was actively recruited for the position with XPO, and was considered highly qualified.  In his position as Senior Vice President of Acquisitions, Metzler's primary function was to leverage his experience and network to explore, identify, and analyze potential acquisition opportunities for XPO.  In this role, Metzler contends that his duties included: (1) identification, research, and analysis of potential acquisitions; (2) negotiating letters of intent on approved acquisitions; (3) developing and sustaining a network of deal sources including, but not limited to investment banks, business owners, business brokers, trade associations, and private equity firms; (4) conducting evaluations of companies; (5) conducting due diligence; and (6) coordinating with external advisors and participating in the development of investment strategy.

Under the Employment Agreement, Metzler received a base salary of $300,000 per year, and had the opportunity to earn an annual bonus.  Over the period of his employment, Metzler received Base Salary and Bonus in the total amount of $538,771.  As a senior executive, Metzler was also given the opportunity to earn a substantial equity stake in XPO; therefore, the Employment Agreement provides that Metzler would receive 85,000 restricted stock units ("RSUs"), to vest in equal annual installments of 20% beginning September 2, 2012, subject to Metzler's continued employment.  Metzler received 85,000 RSUs, 17,000 of which had vested prior to his termination, with a value on the date of vesting, net of withholding taxes, of at least $195,000.

Prior to his employment with XPO, Metzler held board and advisory positions with other companies, including but not limited to 33 Integrated Solutions ("M33") and Flash Global

Logistics ("Flash").  Before he was hired, Metzler informed XPO about his roles with these companies, and offered to resign from these positions in order to maintain his employment with XPO.  However, after discussions with XPO and a substantive review by XPO's management and board of directors of the companies and positions held by Metzler, XPO approved Metzler to remain in his board and advisory positions.

During his employment with XPO, Metzler was successful in identifying and pursuing three companies, which resulted in XPO acquiring these companies, each with annual revenues between $22 and $43 million.  Metzler had access to XPO confidential information regarding, among other things, XPO's competitive and acquisition strategies and investment and acquisition targets.  Metzler reported directly to the CEO of XPO.

On May 2, 2013, Metzler was placed on paid leave pending an investigation into suspected activities that were adverse to XPO's interests.  On May 6, 2013, XPO sent Metzler a letter titled "Cause of Termination of Your Employment," stating that Metzler was:

> (1) failing to cooperate in good faith with an internal Company investigation with which the Company asked you to cooperate; and (2) refusing my lawful directives as Chief Executive Officer of the Company.  As a result, I am writing to notify you that "Cause" (as defined by your October 5, 2011 Employment Agreement) exists to terminate your employment with XPO.  To the extent these violations are curable, you have 15 days in which to cure them, as specified in paragraph 4(c) of your Employment Agreement.

(Dkt. #78, Declaration of Jacobs, Ex. G, p. 1).  On May 31, 2014, XPO sent Metzler a letter titled "Notice of Termination of Your Employment for Cause" (the "Termination Notice").  The Employment Agreement provides that XPO "may terminate Employee's employment hereunder for Cause by written notice at any time" (Dkt. #78, Ex. A § 4(c)).  "Cause" is defined as, among other things:

> (i) "material dereliction of duties or his negligence or substantial failure to perform his duties hereunder;"

(ii) "willful refusal to follow any lawful directive of the CEO, CAO, the Board, or any other executive officer to whom Employee reports;"
(iii) "commission of any fraud, embezzlement, theft, or dishonesty, or any deliberate misappropriation of money or other assets of the Company;"
(iv) "material breach of any term of this [Employment] Agreement…;"
(v) "any willful act, or failure to act, in bad faith to the material detriment of the Company;" and
(vi) "willful failure to cooperate in good faith with a governmental or internal investigation of the Company of any of its directors, managers, officers or employees, if the Company requests his cooperation."

*Id*. Upon termination for Cause, "[a]ll unvested RSUs… shall be forfeited", and XPO has the right to "cancel the RSUs, including any vested amounts thereof, and require Employee to forfeit or remit to the Company… the after-tax net amount… received by the Employee, in respect of any RSUs." *Id*. at §§ 3(c), 5(g).

XPO contends that in February of 2013, Metzler was solicited by Expert Network Group ("ENG") to refer acquisition deals in the asset-light logistics sector to ENG's client Moelis Capital Partners, LLC ("Moelis"). XPO contends that Moelis is a direct competitor of XPO for acquisitions in the asset-light logistics sector. XPO asserts that Metzler agreed to accept a seat on the Board of Directors of every target he identified that Moelis acquired as a result of his work for ENG and Moelis. XPO contends that Metzler disclosed Target A to Moelis as a potential acquisition target. Target A was then and remains now of interest to XPO as an acquisition candidate and XPO met with Target A as recently as January 2014 to discuss a potential acquisition. XPO contends that Metzler also disclosed to Moelis two other potential targets, one of which was actually acquired by XPO after Metzler disclosed it to Moelis.

Metzler contends that when ENG first contacted him, he believed ENG was referring an opportunity to XPO, and only later understood that ENG and Moelis wanted Metzler to refer opportunities to them. Metzler asserts that he believed that maintaining good relations with ENG and Moelis could lead to future acquisition discussions and negotiations which could benefit

XPO, so he agreed to have a discussion with Moelis regarding acquisitions that were entirely non-competitive and non-conflicting with XPO.  Metzler asserts that he informed both Moelis and ENG that he did not want to be compensated since this was to be simply an informal networking relationship only.  He never executed, nor intended to execute, any agreement with ENG or Moelis; and he never promised any personal benefit from his limited relationship with ENG or Moelis.  Metzler asserts that Target A was not a legitimate acquisition target during Metzler's time with the company, and that XPO and Jacobs showed no interest in acquiring Target A.  Jacobs later told Metzler that the investment community would think XPO was "crazy" if it did an acquisition of Target A because they were a home delivery company.  The two additional companies referred to by XPO are 3PD and Home Direct, and Metzler contends that he did not discuss these companies with Moelis, and believes that these discussions did not occur.

XPO also asserts that Metzler was aware that XPO was seeking to acquire Target B, and had made a substantial investment of time, resources, and money into that effort.  Metzler was on the acquisition team, and was aware that Target B had critical salespeople who represented an important part of its value.  Metzler recommended to the CEO of another company ("Target C") that was itself an XPO acquisition target for which Metzler was responsible, that Target C should hire one of Target B's salespeople.  XPO asserts that this created the risk that Target B would lose an important revenue-generating employee at the very time that XPO was working to acquire the company.

Metzler contends that XPO complains about his recommendation of a salesperson working at Target B to Target C for a transportation management services position despite the fact that XPO has never offered transportation management services, and earlier that year,

Metzler recommended the same salesperson for a position at XPO. The salesperson was interviewed and considered, but was not ultimately hired. Metzler asserts that no one at XPO stated that this salesperson was such a valuable asset of Target B that his leaving the company would have a detrimental impact on the valuation of the company, and there is no evidence that it would have had a material impact. Metzler states that his sole purpose in making the recommendation was to strengthen the relationship with Target C for the benefit of XPO.

XPO also asserts that Metzler failed to disclose a potential acquisition opportunity in Home Delivery America, Inc., a company specializing in in-home and business-to-business delivery and logistics. XPO contends that the target was disclosed to Metzler by Individual C, a lawyer who represents XPO in certain matters, and the two of them pitched opportunities to each other without regard for and contrary to XPO's interests. XPO also contends that Metzler failed to disclose his dealings with several firms that recruited him for consultation services.

Metzler asserts that Jacobs told him that XPO did not have any interest in making acquisitions in the segment of the market in which Home Delivery America, Inc. specializes. Metzler also contends that he made connections with various firms, and attended various meetings to learn about opportunities that were beneficial to XPO.

XPO also asserts that Metzler disclosed confidential information regarding XPO to other third-parties and dealt behind XPO's back on behalf of himself and other parties. XPO also asserts that Metzler failed to cooperate with the investigation, and failed to follow directives. Metzler contends that he did not disclose confidential XPO information to anyone, and primarily engaged in these relationships for the benefit of XPO. Metzler also asserts that he cooperated to the best of his ability with XPO's changing and varied demands throughout the investigation.

## PROCEDURAL HISTORY

On February 24, 2014, Metzler filed his motion for partial summary judgment (Dkt. #76).  On March 21, 2014, XPO filed its response (Dkt. #90).  On April 10, 2014, Metzler filed his reply (Dkt. #101).

On February 25, 2014, XPO filed its motion for partial summary judgment (Dkt. #78, #79, #80).  On March 21, 2014, Metzler filed his response (Dkt. #92, #93).  On April 10, 2014, XPO filed its reply (Dkt. #103).  On April 21, 2014, Metzler filed his sur-reply (Dkt. #108).

On April 22, 2014, Metzler filed his motion to strike XPO's reply in further support of its summary judgment motion (Dkt. #109).  On May 1, 2014, XPO filed its response to this motion (Dkt. #111).  On May 19, 2014, Metzler filed his reply (Dkt. #114).

On May 1, 2014, XPO filed its motion for leave to supplement the summary judgment record (Dkt. #110).  On May 19, 2014, Metzler filed his response to this motion (Dkt. #113).  On May 29, 2014, XPO filed its reply (Dkt. #115).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment.  *Casey*

*Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted).  The substantive law identifies which facts are material.  *Anderson,* 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Id.* at 247.  If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case.  *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News*, *Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).  Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial."  *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49).  The nonmovant must adduce affirmative evidence.  *Anderson*, 477 U.S. at 257. The Court must consider all of the evidence but refrain from making any credibility determinations or weighing the evidence.  *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

*A.  Metzler's Motion to Strike XPO's Reply in Further Support of Its Summary Judgment Motion (Dkt. #109) and XPO Logistics, Inc.'s Opposed Motion for Leave to Supplement Summary Judgment Record (Dkt. #110)*

The Court combines the analysis of these two motions, as they raise exactly the same issue:  whether XPO's evidence submitted in response to Metzler's objections to the summary judgment evidence and as an attachment to its reply brief is properly submitted to the Court for consideration.  At the outset, the Court notes that although both parties accuse the other of severe

prejudice resulting from the unnecessary increase in litigation costs arising from the filing of multiple motions and repeated assertions regarding the facts and legal arguments made in this case, it is clear that both parties, to quote Plaintiff, have "no reservations about filing a multitude of motions rehashing the same facts and circumstances repeatedly" (Dkt. #113 at 7).  The Court assumes nothing from this other than a firm resolve on the part of counsel for both parties to zealously represent their clients' positions on the facts and law as they see fit under the Federal Rules of Civil Procedure and the Eastern District of Texas Local Rules.

The parties also actively dispute various factual arguments in the motion to strike and motion for leave to supplement.  The Court will not consider the factual disputes in this section, but will instead, reserve its analysis on the substantive issues presented in this case for the analysis addressing the parties' motions for summary judgment.

Metzler moves to strike the reply brief of XPO filed in support of its motion for partial summary judgment on the basis that it presents new, improper, and untimely evidence (Dkt. #109).  Metzler's argument rests on his interpretation of Eastern District of Texas Local Rule ("Local Rule") CV-56(d), which provides that "[a]s used within this rule, 'proper summary judgment evidence' means excerpted copies of pleadings, depositions… affidavits or declarations…, and other admissible evidence cited in the motion for summary judgment or the response thereto."  Metzler argues that the omission of evidence submitted in a reply brief from this rule is "conclusive evidence" to demonstrate that the affidavits, declarations, or other evidence submitted in conjunctive with a reply brief is not "proper summary judgment evidence" under these rules.  Metzler goes on to argue that it is "well-settled" in Texas federal district courts that new evidence may not be submitted in a reply brief, citing cases from the Northern District of Texas in support of this proposition.

XPO asserts that its initial summary judgment evidence was proper, that it was entitled to respond to Metzler's objections to the evidence with further declarations that established the authenticity and personal knowledge of the affiants, and that it was proper to address matters raised by Metzler in his responsive brief with evidence responsive to those matters in its reply brief.  XPO contends that federal courts have recognized a movant's right on summary judgment to address in reply briefs issues raised by an opponent in its response, especially when the opponent has an opportunity to respond to the evidence submitted.

There is no provision of the Federal Rules of Civil Procedure or the Local Rules that prohibits filing evidence in a reply brief.[2]  In fact, the Local Rules themselves contemplate this procedure.  *See* Local Rule CV-7(a) (referring to "attachments" to a reply brief).  The Court does not adopt Metzler's view that the exclusion of evidence submitted in support of a reply brief from the definition of "proper summary judgment evidence" as set out in Local Rule CV-56(d) necessarily means that evidence may not be submitted in a reply brief at all.  This Court's general practice is to allow the submission of evidence in a reply brief when the evidence submitted responds to issues raised by the response brief.[3]  The Fifth Circuit has addressed this issue, stating that "Rule 56(c) merely requires the court to give the non-movant an adequate opportunity to respond prior to a ruling" and noted that "those circuits that have expressly addressed this issue have held that a district court may rely on arguments and evidence presented for the first time in a reply brief as long as the court gives the nonmovant an adequate opportunity to respond."  *Vais Arms., Inc. v. Vais*, 383 F.3d 287, 292 (5th Cir. 2004) (quoting *Southwestern Bell Tel. Co. v. City of El Paso*, 346 F.3d 541, 545 (5th Cir. 2003)).

---

[2] The Court agrees with XPO that a discussion of the Local Rules of the Northern District of Texas, as well as case law interpreting those rules, is irrelevant to the discussion before the Court as this issue relies heavily on Eastern District of Texas local rules and their interpretation.

[3] This Court has also permitted, in rare and limited circumstances, a party to file evidence in a sur-reply brief that responds to evidence submitted in a reply brief.

In this case, XPO's submission of evidence in its reply brief is in response to Plaintiff's objections to the original summary judgment evidence submitted by XPO.  It does not raise any new substantive issues to which Metzler was required to respond.  Further, any potential prejudice to Metzler was alleviated by the ability to file a sur-reply brief to the summary judgment motion (Dkt. #108), a reply brief in support of its objections to the summary judgment evidence (Dkt. #106), a motion to strike (Dkt. #109), and a response to XPO's motion for leave to supplement (Dkt. #113).  Further, the Local Rules also permit a party to ask for leave from the Court to submit additional evidence if necessary, and motions for leave to exceed page limitations if more briefing is required.  *See* Local Rule CV-7(k) & (l).  Thus, the Court finds that the evidence submitted by XPO in its reply was proper to respond to Metzler's objections to the evidence, and there is no basis to strike that evidence.  Accordingly, Metzler's Motion to Strike XPO's Reply in Further Support of Its Summary Judgment Motion (Dkt. #109) is denied, and XPO Logistics, Inc.'s Opposed Motion for Leave to Supplement Summary Judgment Record (Dkt. #110) is granted.

## B.  Plaintiff's Motion for Partial Summary Judgment (Dkt. #76)

Metzler moves for partial summary judgment on his claims for invasion of privacy and conversion, and on XPO's counterclaims for breach of contract-return of property provision, breach of contract-cooperation provision, and conversion.

In order to demonstrate a right to a claim for invasion of privacy, specifically intrusion upon the plaintiff's seclusion or solitude, Metzler must demonstrate: (1) an intentional intrusion, physically or otherwise, upon another's solitude, seclusion, or private affairs or concerns, which (2) would be highly offensive to a reasonable person.  *Valenquela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993); *see also Billings v. Atkinson*, 489 S.W.2d 858, 859-60 (Tex. 1979).  Metzler

argues that XPO intentionally delved into Metzler's personal solitude, seclusion, and private affairs when they took possession of his personal laptop and gained access to it, took possession of his personal iPad and attempted to gain access to it, fully imaged and copied the contents of his personal laptop and business laptop, demanded he give XPO access to his personal iPhone, personal hard drives, usernames and passwords to personal email accounts, and username and passwords to personal online storage accounts, and demanded he turn over to XPO all communications with the companies that he advised.

First, the Court finds that there is no intentional intrusion into Metzler's solitude, seclusion, or private affairs with regard to XPO's demands that Metzler give XPO access to his personal iPhone, hard drives, accounts, and other communications received by Metzler. Plaintiff's assertion is that XPO demanded access to this information, and Metzler refused. Thus, no intentional intrusion actually took place.  As to the imaging of the business laptop, under Texas law, an employee has no reasonable expectation of privacy in the contents of materials sent or stored on a company computer system.  *See McLaren v. Microsoft Corp.,* No. 05-97-00824-CV, 1999 WL 339015, at *4 (Tex. App. – Dallas, May 28, 1999, no pet.).  The *McLaren* court found that the e-mail messages at issue "contained on the company computer were not [plaintiff's] personal property, but were merely an inherent part of the office environment" and that such e-mails "were first transmitted over the network and were at some point accessible by a third-party." *Id*. at *4.  The same is true here of materials sent or stored on the company laptop provided to Metzler.

The Court will now turn to the allegations that XPO intruded into Metzler's personal solitude, seclusion, and private affairs when they took possession of his personal laptop and iPad, gained access to these devices, and had the personal laptop fully imaged and the contents copied.

Metzler asserts that at the outset of his employment he was not provided with a company computer for XPO business purposes, and, therefore, he was required to use his personal laptop and iPad to conduct XPO business.  XPO asserts that its policies put Metzler on notice that he had "no right of privacy" in anything, that material placed on XPO's systems or equipment was "not confidential," and was "the property of XPO" (Dkt. #90, Ex. D).  XPO also has a policy prohibiting employees from "conduct[ing] Company business on personal computers" or "send[ing] any Company confidential or proprietary material to a personal computer or personal email account."  *Id*. at Ex. B, Ex. D.  XPO further claims that because no one has reviewed the contents of the personal devices, that there has been no intrusion at all, and that if a review was conducted, it would have been entirely warranted so that XPO could remove its property.  The Court finds that there is a fact issue as to whether there was an intentional intrusion into the seclusion of Metzler that a reasonable person would have found highly offensive.  Summary judgment is denied on this claim.[4]

In order to demonstrate a claim for conversion, Metzler must show that: (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's right; and (3) the defendant refused the plaintiff's demand for the return of the property.  *City Bank v. Compass Bank*, 717 F. Supp. 2d 599, 611-12 (W.D. Tex. 2010) (citing *Huffmeyer v. Mann,* 49 S.W.3d 554, 558 (Tex. App. – Corpus Christi 2001, no pet.)).  It is undisputed that Metzler owned, had legal possession of, or was entitled to possession of his personal property – the laptop and iPad.  Further, XPO assumed and exercised dominion and control over the property when it seized Metzler's personal

---

[4] XPO also moves for summary judgment on Metzler's claim for alleged intrusion of privacy.  For the same reasons as stated *supra*, summary judgment is denied on this claim.

property, and prohibited him from obtaining it back.  The Court is not persuaded by XPO's argument that the devices contain XPO property, which means that Metzler is not entitled to possession of the devices.  The devices are the personal property of Metzler, and remain in the possession of XPO.  Additionally, it is true that Metzler's counsel agreed to allow counsel for XPO to retain the laptop and iPad for a period of time until the parties could mutually agree upon a reasonable protocol to review these devices; however, Metzler's counsel did not agree to allow XPO to keep Metzler's personal property forever.  Metzler's evidence reveals that as of May 29, 2013, a mutually-agreeable protocol for imaging the devices was in place (Dkt. #93 at Ex. AC). However, the parties reached an impasse as to whether Metzler would share equally in the costs of imaging.  *Id*.  Apparently both devices have been imaged already.  However, the Court is unable to determine from the evidence submitted whether there has been a request for return of the property after the May 29, 2013 protocol was agreed to by the parties.  Metzler asserts that he has requested the return of his personal property many times, and XPO asserts that he has not. Thus, there is a fact issue, and summary judgment is denied on this claim.[5]

Metzler also moves for summary judgment on XPO's counterclaim of conversion.  In support of its claim for conversion, XPO asserts that Metzler was given the use of XPO property, including, but not limited to, XPO computers, phones, and other electronic devices, and XPO proprietary and confidential information.  XPO asserts that Metzler failed to return the property and/or failed to allow XPO to retrieve the information from his personal devices despite multiple demands.  Metzler contends that there is no evidence to support this claim.  XPO does not substantively address this claim, other than to state that Metzler has never returned XPO information that Metzler imbedded into his personal devices, and that Metzler is not entitled to

---

[5] XPO also moves for summary judgment on Metzler's claim for conversion.  For the same reasons as stated *supra*, summary judgment is denied on this claim.

retain this information.  In response, Metzler argues that his initial instructions from XPO were to delete all XPO electronic data in his possession (Dkt. #93 at Ex. L, Ex. X; Metzler Declaration ¶ 115-116).  Metzler complied with this request, and hired a computer forensic expert to locate and delete all XPO-related information from his personal devices.  *Id*.  XPO received confirmation of the deletion of data, but has since shifted its position to now request the return of the documents.  Metzler did not have any XPO hard documents in his possession to return.  (Dkt. #93, Metzler Declaration ¶ 117-118).  Metzler no longer has any electronic information to return since he complied with XPO's initial request to delete the information.  Thus, there is no basis for XPO's claim of conversion, as Metzler did not retain the information.  Further, the electronic information on the devices allegedly retained by Metzler was not exclusive of XPO's rights to the information, as other copies were stored elsewhere on XPO's server systems.  Thus, the Court finds that summary judgment should be granted in favor of Metzler on XPO's claim for conversion, and XPO's claim for conversion will be dismissed.

Metzler also moves for summary judgment on XPO's claims for breach of contract-return of property provision and breach of contract-cooperation provision; however, the Court will address these two claims and Plaintiff's arguments when it considers them *infra*.

*C.  Defendant/Counterclaim Plaintiff XPO Logistics, Inc.'s Partial Summary Judgment Motion (Dkt. #78)*

Defendant moves for summary judgment on its contract counterclaims asserting that Metzler breached the Full Efforts and Best Interests clause, the No-Consultation clause, the Confidentiality clause, the Competitive Opportunity clause, the Return of Property clause, and the Cooperation clause of the Employment Agreement.  XPO also moves for summary judgment on its declaratory judgment counterclaims that Metzler was validly and properly terminated for cause, its RSU forfeiture claim, on Metzler's claim for breach of contract, its claims for breach

of the duty of loyalty, Metzler's claim for age discrimination, and Metzler's claim for tortious interference.

The first argument that must be addressed it what law applies to the Employment Agreement entered into by the parties.  Metzler asserts that Texas law governs the Employment Agreement, whereas XPO contends that New York law should be applied.

To determine the applicable law, a federal court sitting in diversity applies the choice of law rules of the forum.  *Benchmark Electronics, Inc., v. J.M. Huber Corp*., 343 F.3d 719, 726 (5th Cir. 2003) (citing *Spence v. Glock, Ges.m.b.H*., 227 F.3d 308, 311 (5th Cir. 2000)). Accordingly, Texas choice of law rules apply.

The Employment Agreement contains a choice of law provision that states:

> This Agreement shall be governed by and construed in accordance with its express terms, and otherwise in accordance with the laws of the State of New York without reference to its principles of conflicts of law.

(Dkt. #78, Ex. A at 16 § 10(k)).  Both parties executed this agreement by signing the agreement. Before we apply New York law to the issues here, we must determine whether the choice of law provision contained in the parties' Employment Agreement is enforceable.

Texas courts analyze the enforceability of choice of law provisions under sections 187 and 188 of the Restatement (Second) of Conflict of Laws (the "Restatement").  *See DeSantis v. Wackenhut, Corp*., 793 S.W.2d 670, 677-78 (Tex. 1990).  Section 187(1) provides that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue."  Restatement § 187(1); *see also DeSantis*, 793 S.W.2d at 677-78.  The initial inquiry – whether the issue is one which the parties could resolve by an explicit agreement – must be conducted pursuant to the laws of the state identified by applying the test

outlined in section 188 of the Restatement.  *See* Restatement § 187(1) cmt. c.  Thus, the Court will consider (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicil, residence, nationality, place of incorporation and place of business of the parties.  *See* Restatement § 188(2).  Metzler signed the agreement in Texas, and Mr. Jacobs for XPO signed the agreement, although it is unclear where.  Metzler negotiated the contract from Texas, and XPO asserts that counsel for XPO negotiated the agreement from New York.  The place of performance of the contract was primarily Texas, as that is where Metzler lived and worked; however, Metzler did negotiate with potential customers or clients of XPO in various locations across the United States, and Metzler traveled to New York on occasion to conduct XPO business.  The location of the subject matter of the contract is the same as the place of performance.  XPO is incorporated in Delaware and headquartered in Connecticut, and Metzler is located in Texas.  Based on this test, it appears that the state with the most significant relationship to the contract is Texas, since Metzler both lived and worked here and conducted most of his part of the contract from Texas.  While there were other activities connected to other parts of the United States, Texas has the most significant relationship to the contract.  Thus, the Court will look to the law of Texas to identify whether the issue is one which the parties could resolve by an explicit provision in the parties' agreement.

XPO asserts that Texas law would permit parties to agree to provide particular remedies for breach of one party's contractual duties, such as a return of compensation in the event of a breach of duty pursuant to an employment agreement.  XPO contends that here the parties could have entered into an explicit agreement providing for a return to XPO of compensation during any period in which Metzler was breaching the contract by being disloyal in breach of his

fiduciary duty.  Metzler contends that a provision of this sort would be fundamentally opposed to Texas law and public policy because the "faithless servant" doctrine requires disgorgement of the entirety of the employee's compensation paid during the period of alleged faithlessness without any right to an offset or equitable retention of the value the employee provided during the period (Dkt. #108 at 9 (citing *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003)).  Metzler contends that New York law requires automatic forfeiture of any and all compensation upon a showing of liability.  The Court disagrees.  In the *Phansalkar* case, cited by Metzler, the Second Circuit considered the fact that forfeiture can be limited in some circumstances; however, the ultimate conclusion was that in the *Phansalkar* case, the forfeiture could not appropriately be limited to only some transactions because the agreement called for general compensation and did not limit compensation to specific amounts paid for the completion of specific tasks.  344 F.3d at 207-08.  However, the Second Circuit does not state that forfeiture is automatic and due without any proof that an employer suffered any damages. Further, the Texas Supreme Court found that "courts may fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty," and going on to explain that "a fiduciary may be required to forfeit the right to compensation for the fiduciary's work."  *ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010).  The Texas Supreme Court also stated, "the remedy of forfeiture is necessary to prevent such abuses of trust, regardless of proof of actual damages."  *Id*. at 874.  Thus, the remedy of fee forfeiture is certainly one that is contemplated and applied by Texas law, and does not controvert Texas public policy.  Thus, the Court finds that the parties could have entered into an explicit agreement providing for a return to XPO of compensation paid during any period in which Metzler was breaching the contract by being disloyal in breach of his fiduciary duty.

Accordingly, Restatement Section 187(1) applies, and New York law, the law chosen by the parties in the Employment Agreement, will govern the contract dispute and breach of fiduciary duty claim in this case.[6]

A claim for breach of contract requires the formation of a contract, performance by one party, failure to perform by another, and resulting damage. *New York State Workers' Compensation Bd. v. SGRisk, LLC*, 116 A.D.3d 1148, 983 N.Y.S.2d 642, 648 (App. Div. 2014) (citing *Torok v. Moore's Flatwork & Founds., LLC*, 106 A.D.3d 1421, 1422, 966 N.Y.S.2d 572 (App. Div. 2013)). "When interpreting contracts, we have repeatedly applied the 'familiar and eminently sensible proposition of law [] that, when parties set down their agreement in a clear, complete document, their writing should… be enforced according to its terms.'" *Vermont Teddy Bear Co. v. 538 Madison Realty Co*., 1 N.Y.3d 470, 475 (N.Y. 2004). "Hence, 'courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" *Id.*

XPO moves for summary judgment for breach of contract of the full efforts and best interest clause, the non-consultation clause, the confidentiality clause, the competitive opportunity clause, the return of property clause, and the cooperation clause of the Employment Agreement. Metzler similarly moves for summary judgment on the return of property clause and the cooperation clause.

The full efforts and best interest clause requires that Metzler "devote his full working time, energy and attention to the performance of his duties and responsibilities hereunder and shall faithfully and diligently endeavor to promote the business and best interests of the

---

[6] The Court also notes that the parties agree that Texas law should govern the invasion of privacy, conversion, and tortious interference with a contract claims, as the parties cited Texas law exclusively to the Court for its consideration of the relevant law. In addition, Metzler's age discrimination claim is governed by the relevant federal law.

Company" (Dkt. #78, Ex. A § 1(c)).   The Court finds that there are genuine disputes as to material facts at issue in determining whether Metzler breached this provision of the agreement, and denies summary judgment on this claim.

The non-consultation clause prohibits Metzler from "engag[ing] in business with, serv[ing] as an agent or consultant to, becom[ing] an employee, partner, member, principal, stockholder or other owner… of, any Competitive Business."  *Id.* at § 7(b).   It defines Competitive Business as "any individual, employeeship, corporation, limited liability company, partnership, unincorporated organization, trust, joint venture or other entity (i) that engages in or may engage in acquisition related or mergers and acquisition activities related to the transportation or third-party logistics industry… (ii) … providers of third-party logistics services, including, without limitation, freight brokerage, freight forwarding, expediting or intermodal providers."  *Id.*  The Court finds that there are genuine disputes as to material facts at issue in determining whether Metzler breached this provision of the agreement, and denies summary judgment on this claim.

The confidentiality clause requires Metzler to "hold in strict confidence any Confidential information related to any of the Company Entities."  *Id.* at § 7(a). Confidential Information is defined as "all confidential or proprietary information of any of the Company Entities."  *Id.*  The Court finds that there are genuine disputes as to material facts at issue in determining whether Metzler breached this provision of the agreement, and denies summary judgment on this claim.

The competitive opportunity clause states that if, during his employment, Metzler:

(i) acquires knowledge of a potential investment, investment opportunity or business venture which may be an appropriate for investment by the Company, or in which the Company could otherwise have an interest or expectancy (a "Competitive Opportunity"), or (ii) otherwise is then exploiting any Competitive Opportunity, Employee shall promptly bring such Competitive Opportunity to the Company.  In such event, Employee shall not have the right to hold any such

Competitive Opportunity for his (and his agents', employees' or affiliates') own
account and benefit or to recommend, assign or otherwise transfer or deal in such
Competitive Opportunity with persons other than the Company.

*Id*. at § 7(d).  The Court finds that there are genuine disputes as to material facts at issue in

determining whether Metzler breached this provision of the agreement, and denies summary

judgment on this claim.

The return of company property clause states that:

All documents, data, recordings, or other property, including, without limitation,
smartphones, computers and other business equipment, whether tangible or
intangible, including all information stored in electronic form, obtained or
prepared by or for Employee and utilized by Employee in the course of his
employment with the Company shall remain the exclusive property of the
Company and Employee shall return all copies of such property upon any
termination of his employment and as otherwise requested by the Company
during his Term.

*Id*. at § 7(e).  XPO asserts that Metzler has never returned XPO information that Metzler

imbedded into his personal devices in breach of this provision, and that Metzler is not entitled to

retain this information.  In response, Metzler argues that his initial instructions from XPO were

to delete all XPO electronic data in his possession (Dkt. #93 at Ex. L, Ex. X; Metzler Declaration

¶ 115-116).  Metzler complied with this request, and hired a computer forensic expert to locate

and delete all XPO-related information from his personal devices.  *Id*.  XPO received

confirmation of the deletion of data, but has since shifted its position to now request the return of

the documents.  Metzler did not, and does not, have any XPO hard documents in his possession

to return.  (Dkt. #93, Metzler Declaration ¶ 117-118).  Metzler no longer has any electronic

information to return since he complied with XPO's initial request to delete the information.

Thus, there is no basis for XPO's claim of breach of the return of property provision, as Metzler

complied with the request of XPO to delete the information.  Thus, XPO's motion for summary

judgment on this claim will be denied, and Metzler's motion for summary judgment on this claim will be granted.

Finally, the cooperation clause in the Employment Agreement requires Metzler to provide his "reasonable cooperation in connection with any suit, action or proceeding… and any investigation occurring during Employee's employment with any Company Entity" (Dkt. #78, Ex. A at § 7(g)). The Court finds that there are genuine disputes as to material facts at issue in determining whether Metzler breached this provision of the agreement, and denies summary judgment on this claim.

Based on the finding of the Court that there are genuine issues of material fact regarding many of the contract provisions that Metzler allegedly breached, the Court finds that there are genuine issues of material fact that must be resolved before the Court can determine whether Metzler was terminated for cause as defined in the contract, and whether XPO is entitled to declaratory judgment. Those same issues of material fact must first be resolved prior to finding whether or not XPO is entitled to recover the net proceeds received by Metzler on his sale of stock covered by the RSUs, as outlined in Section 5(g) of the Employment Agreement. Thus, the Court finds that summary judgment is denied on these claims as well.

XPO moves for summary judgment on its claim for breach of fiduciary duty. "An employee's fiduciary duty to his employer prohibits him from 'acting in any manner inconsistent with his agency or trust,' and he is 'at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." *Gortat v. Capala Bros., Inc.*, 585 F. Supp. 2d 372, 376-77 (E.D.N.Y. 2004) (applying New York law). XPO asserts that Metzler failed to exercise good faith and loyalty in the performance of his duties, and acted inconsistently with XPO's interests. Metzler asserts that he was a good employee, performed well for XPO, and did not act

in a way that was inconsistent or adverse to XPO's interests.  The Court finds that there are genuine disputes as to material facts at issue in determining whether Metzler breached his fiduciary duty of loyalty, and denies summary judgment on this claim.

XPO also moves for summary judgment on Metzler's claim for tortious interference with a contract.  As a preliminary matter, the Court does not condone including complete summary judgment arguments in footnotes to the Court.   However, the Court will consider XPO's arguments.  Under Texas law, "[t]he elements of a cause of action for tortious interference with an existing contract are (1) the existence of a contract subject to interference, (2) a willful and intentional act of interference, (3) such act was a proximate cause of damage, and (4) actual damage or loss occurred."  *COC Services, Ltd. v. CompUSA, Inc*., 150 S.W.3d 654, 670 (Tex. App. – Dallas 2004, pet. denied).  XPO asserts that this claim should be dismissed because Metzler cannot show that XPO had knowledge of any contractual confidentiality provisions he had with any party, that XPO intentionally induced Metzler to breach his contracts with these third parties, and that confidentiality has been breached at all by XPO (Dkt. #78 at 18 n.8).

Metzler contends that prior to his employment with XPO, XPO conducted an investigation into the business practices of the companies that Metzler advised to determine whether it would allow Metzler to continue to serve as a board member (Dkt. #93, Declaration of Metzler ¶¶ 108-112, Exs. V & W).  Metzler disclosed all of his board and advisory positions with other companies, and informed XPO that he owed a duty of confidentiality to those companies.  *Id*. Metzler states that XPO's actions in seizing his personal laptop and iPad caused him to involuntarily disclose confidential information regarding those companies.  *Id*.  Metzler has demonstrated that there is a genuine issue of material fact as to this claim, and XPO's motion for summary judgment is denied on this claim.

Finally, XPO moves for summary judgment on Metzler's claim for age discrimination and retaliation.  Under the ADEA, it is "unlawful for an employer... to discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age."   29 U.S.C. § 623(a)(1). Intentional discrimination may be shown by either direct or circumstantial evidence.  *Alvarado v. Texas Rangers,* 492 F.3d 605, 611 (5th Cir. 2007) (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001)).   "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption."  *Sandstand v. CB Richard Ellis, Inc*., 309 F.3d 893, 897 (5th Cir. 2002).   Metzler presents no direct evidence of discrimination; therefore, his claim will be analyzed using the framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Alvarado*, 492 F.3d at 611.  A plaintiff must first establish a prima facie case of intentional discrimination.  *Id*.  If Metzler satisfies this requirement, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  *Id*.  "If the employer sustains its burden, the prima facie case is dissolved, and the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another motivating factor is the plaintiff's protected characteristic."  *Id*. (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

To establish a prima facie case for age discrimination, Metzler must show: (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either (i) replaced by someone outside the protected class, (ii) replaced by someone younger, or (iii) otherwise discharged because of his age.  *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 575-76 (5th Cir. 2003); *Rexses v. Goodyear Tire & Rubber*

*Co.*, 401 F. App'x 866, 868 (5th Cir. 2010).  The third alternative of the last element applies in circumstances where the plaintiff is not replaced.  *Rexses*, 401 F. App'x at 868.  XPO asserts that Metzler cannot demonstrate that he was replaced by someone outside the protected class, or that he was otherwise discharged because of his age.  XPO has not replaced Metzler (Dkt. #78, Declaration of Jacobs ¶ 5 n.1).  Metzler does not respond to XPO's arguments regarding age discrimination, and presents no evidence that Metzler was terminated because of his age.  XPO has clearly asserted a variety of reasons for its termination of Metzler, none of which are related to age, and, if true, would be legitimate, non-discriminatory reasons for an adverse employment decision.  Thus, the Court finds that Metzler cannot make out a prima facie case of age discrimination, summary judgment should be granted in favor of XPO on this claim, and Metzler's claim for age discrimination should be dismissed.

XPO also asserts that Metzler cannot satisfy his burden on summary judgment to demonstrate that XPO retaliated against him for asserting a claim for age discrimination.  As XPO asserts, the actual timing of events demonstrates that Metzler's first mention of alleged age discrimination was in his original state court petition, filed on May 15, 2013 (Dkt. #78, Declaration of Robinson, Ex. B, No. 5).  As of that date, the undisputed facts demonstrate that XPO's investigation was already underway, Metzler had already been put on paid leave, and he had already received XPO's Notice of Cause for Termination letter (Dkt. #78, Declaration of Jacobs ¶ 19).  Metzler does not respond to this argument or provide any evidence at summary judgment regarding this claim.  Thus, the Court finds that Metzler cannot establish a claim for retaliation, and summary judgment should also be granted in favor of XPO on this claim.

**CONCLUSION**

Based on the foregoing, the Court finds that Plaintiff's Motion for Partial Summary Judgment (Dkt. #76) is **GRANTED IN PART** and **DENIED IN PART**, Defendant/Counterclaim Plaintiff XPO Logistics, Inc.'s Partial Summary Judgment Motion (Dkt. #78) is **GRANTED IN PART** and **DENIED IN PART**, Metzler's Motion to Strike XPO's Reply in Further Support of Its Summary Judgment Motion (Dkt. #109) is **DENIED**, and XPO Logistics, Inc.'s Opposed Motion for Leave to Supplement Summary Judgment Record (Dkt. #110) is **GRANTED**.

Accordingly, XPO's claims for conversion and for breach of the return of property provision in the contract are dismissed with prejudice.  In addition, Metzler's claims for age discrimination and retaliation are dismissed with prejudice.

Metzler's claims for declaratory judgment, breach of contract, invasion of privacy – intrusion on seclusion, conversion, and tortious interference with a contract remain for trial. XPO's counterclaims for breach of contract regarding the full efforts and best interests provision, the non-consultation provision, the confidentiality provision, the competitive opportunity provision, and the cooperation provision, declaratory judgment regarding termination for cause, breach of contract regarding the RSU forfeiture provision, breach of fiduciary duty, usurpation of corporate opportunity, and injunctive relief remain for trial.

**IT IS SO ORDERED.**

 **SIGNED this 25th day of September, 2014.**

_____
AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE